A formal complaint was filed against Robert D. Underwood on October 23, 1990, alleging that Underwood had violated Rules 1.1 (incompetence), 1.2 (failure to abide by the lawful objectives and interests of the clients), 1.3 (neglect), 1.4 (lack of communication with regard to status of cases), 8.4(a) (violating one or more of the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, deceit, fraud and misrepresentations), and 8.4(d) (engaging in conduct that is prejudicial to the administration of justice) of the Mississippi Rules of Professional Conduct. On October 30, 1990, a Complaint Tribunal was appointed to conduct a hearing concerning the allegations of the formal complaint.
The Mississippi State Bar (hereinafter Bar) subsequently filed a motion for entry of default judgment and supporting affidavit on December 17, 1990. Though not previously having responded, Underwood appeared at the Complaint Tribunal hearing on January 3, 1991, and admitted the allegations of the complaint. The Complaint Tribunal entered a default judgment against Underwood and suspended Underwood from the practice of law for one year. Feeling aggrieved, Underwood filed this appeal. On de novo
review, this Court affirms the judgment of the Complaint Tribunal.
 I.
Underwood admitted the allegations of the complaint. On May 13, 1987, Anna Hebert and Deborah Seymour were involved in an automobile accident due to the negligence of a construction company in which they both sustained bodily injuries. Underwood agreed to represent Anna and Deborah with respect to their claims and the claims of their husbands, John Hebert and George Seymour.
Throughout the next year, Underwood assured Mr. and Mrs. Hebert and Mr. and Mrs. Seymour (hereinafter collectively referred to as clients) that he was working on their case. He told them on several occasions that a court date had been set, but each time, he later told them that the court date had been cancelled. These were misrepresentations because no suit had been filed and no court dates had been set.
During the summer of 1989, Underwood advised his clients that USF G had agreed to reimburse the Seymours' insurance company and settle all of their claims. He told his clients that USF G would settle the Seymours' claims for approximately $16,500 and the Heberts' claims for approximately $3,500. Underwood informed his clients that he had received release forms from USF G. The clients set up an appointment with Underwood to sign the forms. On November 16, 1989, they arrived for the meeting, but Underwood was not in the office. His secretary gave them the release forms to sign.
Prior to November 16, 1989, Underwood informed his clients that USF G would have an agent present with a settlement check awaiting receipt of the executed release forms. Subsequently, they were informed that the release forms would have to be mailed and USF G would forward the checks upon their receipt. By the end of 1989, however, they still had not received their checks. Underwood informed them that the process was taking longer than usual because the settlement would be in the form of a check instead of a draft.
On February 10, 1990, Underwood informed Mr. Seymour that he had received the check, that he would deposit the check in his account and that he would send a check to Mr. Seymour by certified mail after allowing two or three days for the check to clear. Underwood informed the Seymours that he would not need their endorsement on the USF G check because he had a "special arrangement at the bank."
One of Underwood's secretaries told the Seymours that a check had been mailed to them the week of February 19, 1990. On February 24, 1990, Mr. Seymour contacted Underwood because the check had not arrived. Underwood informed Mr. Seymour that the check was mailed on the 20th or *Page 66 
the 21st and that he should receive the check no later than February 27, 1990.
On March 5, 1990, Mr. Seymour and Mr. Hebert traveled from Louisiana to meet with Underwood in Brookhaven, Mississippi. Underwood told them that all papers and checks were in Jackson, Mississippi. Underwood told them that he would be in Brookhaven in court for the next two days. He recommended that they return to Louisiana and come back on March 10, 1990.
Later that day, Mr. Seymour and Mr. Hebert learned that Underwood had gone to Jackson. Underwood was serving in the Mississippi Legislature at the time. Mr. Seymour and Mr. Hebert met Underwood at the Capitol. Underwood, once again, suggested that they meet in Brookhaven on March 10, 1990, because the legislative session could go into a night session. Mr. Seymour and Mr. Hebert told him that they did not mind waiting on him. They checked into a hotel and were unable to contact Underwood until the next day when Underwood told them that he would not give them the checks until March 10, 1990. When they threatened to file a complaint with the Bar, Underwood told them to do whatever they wanted to do because he did not care.
Mr. Seymour and Mr. Hebert stopped in Brookhaven on their way back to Louisiana and talked with William Boerner, one of Underwood's associates. Boerner told them that he would make sure that the checks were sent by Federal Express on March 10, 1990, so that they would receive the checks by March 14, 1990.
After not receiving the checks by March 14, 1990, the clients contacted Boerner again. He stated that he told Underwood to take care of the problem and that Underwood informed him that he was too busy to write their checks. The clients then contacted Michael Adoue, an attorney from New Orleans, Louisiana. Adoue sent Underwood a certified letter demanding that he release the settlement checks. Underwood failed to send the checks.
Finally, the clients filed a complaint with the Bar. An investigatory hearing was held on July 25, 1990. At the hearing, it was learned that Underwood lied to his clients about the settlement checks. In fact, USF G never made any settlement offers. Underwood explained that he lied because he did not want his clients to know that he had not done any substantive work on their case. He admitted that he did not have any defense to their allegations.
At the hearing, Underwood assured the Tribunal he was not taking the proceedings lightly. Underwood said it was "a little white lie [that] snowballed into something else."
For the purpose of mitigation, Underwood testified about how the situation arose. He said from the beginning the case was slow moving because of one of the clients' psychological injury and he was waiting for evidence of how long it would take to cure the condition. Underwood said he should have sent the case to someone else.
Underwood was serving in the Legislature at the time, and he said he really did not have time for the case. He said he was not taking personal injury cases anymore, but was restricting his practice to real estate, domestic relations and criminal law. He said he was also explaining the situation to his clients, was relying on more written communication, and had opened his own office. Underwood said he believed a public reprimand would be an appropriate penalty.
In its bench ruling the Tribunal noted that Underwood's conduct was continuous over a two year period, and suspended him for one year.
 II.
Underwood contends that the Tribunal erred in its decision as to the nature of the discipline imposed and did not consider the pertinent factors for determination of the discipline to be imposed. "The Supreme Court of Mississippi (the Court) has exclusive and inherent jurisdiction of matters pertaining to attorney discipline, reinstatement, and appointment of receivers for suspended and disbarred attorneys. . . ." Rule 1(a) of theRules of Discipline *Page 67 for the Mississippi State Bar. On appeal, this Court "shall review the entire record and the findings and conclusions of the Tribunal, and shall render such orders as the Court may find appropriate." Foote v. Mississippi State Bar Association,517 So.2d 561, 564 (Miss. 1987) (quoting Rule 9.4 of the Rules ofDiscipline for the Mississippi State Bar). When reviewing disciplinary matters this Court, "reviews the evidence de novo,
on a case-by-case basis, sitting as triers of fact, and no substantial evidence or manifest error rule shields the Tribunal from scrutiny." Foote, 517 So.2d at 564.
While the review of evidence is de novo, deference is given to the Tribunal's findings "due to its exclusive opportunity to observe the demeanor and attitude of the witnesses, including the attorney, which is vital in weighing the evidence." Broome v.Mississippi Bar, 603 So.2d 349, 353 (Miss. 1992). See alsoMississippi State Bar v. Strickland, 492 So.2d 567, 571 (Miss. 1986).
Punishment for any violation of the Rules of Discipline is considered and imposed on a case-by-case basis and is not governed by a set standard. Vining v. Mississippi State BarAssociation, 508 So.2d 1047, 1049 (Miss. 1987). "This Court will not hesitate to impose substantial sanctions upon an attorney for any act which evinces want of personal honesty and integrity or renders such attorney unworthy of public confidence." Foote,
517 So.2d at 564; Brumfield v. Mississippi State BarAssociation, 497 So.2d 800, 808 (Miss. 1986), cert. denied,481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 502 (1987).
Underwood was found by the Tribunal to have violated the following rules of conduct: Rule 1.1 COMPETENCE, Rule 1.2 SCOPE OF REPRESENTATION, Rule 1.3 DILIGENCE, Rule 1.4 COMMUNICATION, and Rule 8.4 MISCONDUCT.
Underwood's main complaint is the nature of punishment, i.e., the harshness of the punishment. When considering sanctions for misconduct, the Court considers the following: (1) the nature of the misconduct; (2) the need to deter similar misconduct; (3) preservation of dignity and reputation of the profession; (4) protection of the public; and (5) sanctions imposed in similar cases. Broome, 603 So.2d at 353; Steighner v. MississippiState Bar, 548 So.2d 1294, 1297-98 (Miss. 1989).
Underwood knowingly and intentionally lied to his clients. His was not a slight misrepresentation once or twice, it was activity over a two year period which continually became worse. It was not mere negligence; it involved intentional misrepresentation to cover his negligence. The need to deter attorneys from lying to their clients should be apparent. The public clearly needs to be protected from attorneys who lie to them. This was not passive neglect; it was active misrepresentation without regard for the harm and inconvenience and mental anguish of the client.
In many of the cases in which a lesser punishment was imposed, the Tribunal specifically found there was no deliberate conduct. Although the appellant cites Steighner as a case involving more serious violations, the Court noted that Steighner's conduct "does not appear to have been dishonest or fraudulent, but incompetent and negligent." Steighner, 548 So.2d at 1299. Steighner received a 180-day suspension. Id. Appellant's conduct was dishonest and fraudulent — he lied to his clients, even preparing release forms for them to sign when there was no settlement.
Vining dealt with a charge of neglect. Vining allowed the statute of limitations to run, while telling clients the case was being handled. However, this Court found that extenuating circumstances: (1) appellant's personal health, (2) health of a family member, and (3) a matter of personal distress, warranted mercy upon Vining and imposed a public reprimand. Vining, 508 So.2d at 1049.
In Fougerousse v. Mississippi State Bar Association,563 So.2d 1363 (Miss. 1990), this Court affirmed two concurrent 90-day suspensions for Fougerousse. However, Fougerousse was charged only with three code violations for neglecting his clients cases with an adverse effect. Nothing in *Page 68 
the case indicates Fougerousse intentionally lied and misled his clients.
Underwood negligently violated his duty to perform the tasks for which he was hired and further violated his duty to be honest with his clients. His mental state is where we find the seriousness of his violations. This was not mere neglect. He knowingly and intentionally misrepresented the status of the case to his clients all to the personal and financial detriment of his clients. He created a fictional situation and played it out over two years. Underwood argues that his former client suffered no injury because the cases were actually settled. It should be noted that Underwood did not profit from his representations about the imaginary settlements. But his clients' time and effort wasted in tracking him down is certainly an injury to be counted. Further, Underwood's actions only ceased because of the bar complaint. His actions could have potentially caused his clients' claims to be barred.
Underwood expresses regret for his actions, although he does not seem to realize how serious they were. He argues that his service in the Legislature should be considered a mitigating factor. It is apparent that he attempted to use his legislative service in his acts of deceit. Underwood not only disregarded the welfare of his clients, but he needlessly and shamefully attempted to hide from his client through misuse of his membership in the House of Representatives and indeed, in the capitol building itself. Underwood testified before the Tribunal that he had modified his practice to compensate for his time in the Legislature.
Considering all of the above, this Court finds that the one year suspension was appropriate considering Underwood's intentional misconduct.
 III.
Underwood contends that had the Tribunal been forewarned of events occurring after its decision, its ruling would have been different. The matters, however, which Underwood complains of are outside the record, therefore not before this Court. He argues that in Vining, this Court considered extenuating circumstances outside the record of the Tribunal. But in Vining, there was a substantial question of whether the appellant had actually received notice of the Tribunal's hearing. There is no such circumstance here. Furthermore, these events could not have been known at the time of the Tribunal's hearing, as they had not occurred.
The publicity surrounding Underwood's case and his subsequent defeat simply have no bearing on the factors considered in determining the appropriate punishment. Underwood was a public figure. The publicity and potential for political harm does not relate to his law practice. While his defeat may have been caused by the disbarment, he can prove no causal connection. And one cannot help but note that not only did Underwood mislead his clients, he was willing to use his office of public service in his deception. There is no merit in this issue.
SUSPENSION FROM PRACTICE OF LAW FOR ONE YEAR FROM FEBRUARY 11, 1993, AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.