637 So.2d 204 (1994)
Garnett HARRISON
v.
The MISSISSIPPI BAR (Two Cases).
Nos. 91-BA-01222, 91-BA-01223.
Supreme Court of Mississippi.
May 26, 1994.
*206 Garnett Harrison, pro se.
Robert B. McDuff, Jackson, Mary E. Howell, New Orleans, LA, for appellant.
Michael B. Martz, Jackson, for appellee.
EN BANC.
JAMES L. ROBERTS, Jr., Justice, for the Court:

I.

Introduction

A.
On February 2, 1990, the Mississippi Bar ("Bar") filed a formal complaint against attorney Garnett Harrison ("Harrison") alleging misconduct arising from her representation of Dorrie Lynn Singley. On April 2, 1990, the Bar filed a formal complaint against Harrison alleging misconduct arising from her representation of Karen Newsom. Harrison, then residing in Vermont, executed an Acknowledgement of Receipt of Summons and Formal Complaint on August 31, 1990, and filed two discovery requests in the Clerk's office in September of 1990. However, Harrison did not file answers to the complaints. On September 13, 1991, a hearing was held before a Complaint Tribunal on the Bar's Motions for Entry of Default Judgment and Harrison's Motions to Set Aside Entry of Default. Harrison, then residing in Florida, did not appear or send counsel. The Tribunal sustained the Bar's Motions for Default Judgment, and on November 14, 1991, two Orders of Disbarment were entered against Harrison. Harrison appeals, alleging the following errors:
I. WHETHER OR NOT THE COMPLAINT TRIBUNAL IMPROPERLY GRANTED THE MISSISSIPPI STATE BAR MOTION FOR DEFAULT JUDGMENT OF DISBARMENT.
II. WHETHER THE MISSISSIPPI STATE BAR AND THE COMPLAINT TRIBUNAL VIOLATED HARRISON'S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND THE MISSISSIPPI CONSTITUTION OF 1890, ARTICLE III, SECTION 14.
III. WHETHER THE COMPLAINT TRIBUNAL IMPROPERLY IMPOSED THE SANCTION OF DISBARMENT AGAINST HARRISON.
Finding that Harrison's conduct merited disbarment, and that no violation of her state or constitutional rights occurred, we affirm both disbarment orders.

B.
Before proceeding the merits of these cases, we note Harrison's efforts to bring before this Court materials not contained in the appeal records. Harrison contends such supplemental materials are necessary for the Court to understand the circumstances which led to her defaults in the disbarment proceedings.
First, Harrison has filed "Exhibits to Appellant's Brief" for each case. These exhibits, which include newspaper articles, correspondence, depositions, court orders, press releases, etc., are presumably meant to support Harrison's contention that "the disbarment proceedings are inextricably intertwined with a maze of events and court proceedings beginning in the summer of 1986." Harrison has also submitted motions styled "Motion To Remand Or In The Alternative To Permit Supplementing Of Record Or Other Appropriate Relief." Supporting memos (and exhibits to the memos) were also filed. The Motions request that this Court remand her cases for de novo proceedings, or to accept into the record the various exhibits submitted with her brief.
For reasons discussed below, we decline to remand Harrison's cases, or to accept for consideration materials outside the appeal records.

*207 II.

FACTS AND PROCEDURAL HISTORY OF UNDERLYING CASES
A brief history of the Singley v. Foxworth and Newsom v. Newsom cases follows, to provide the context for the disciplinary proceedings against Harrison.

A. Singley v. Foxworth[1]
Dorrie Lynn Singley and Timothy Foxworth were married in May of 1981, and one year later, their daughter Chrystal Marie Foxworth ("Chrissy") was born. Singley and Foxworth separated in August of 1984, and divorced on November 29, 1984. Singley was granted custody of Chrissy, and Foxworth visitation rights.
On March 8, 1985, Foxworth filed a motion for citation of contempt in the Marion County Chancery Court, alleging that Singley had refused to allow him to exercise his visitation rights with Chrissy. During an August 7, 1985, hearing before Chancellor Sebe Dale, Jr., allegations were made that Singley's refusal to allow Foxworth to visit Chrissy were based on her belief that Foxworth was sexually abusing Chrissy. Singley, having moved to Texas after the divorce, did not attend the hearing.
On August 22, 1985, the Chancellor found Singley in contempt for violation of the visitation provisions of the divorce decree, and entered an order for her arrest and incarceration upon her return to the court's jurisdiction. In May 1986, Singley returned to Mississippi, and moved to Bay St. Louis in Hancock County. Singley was arrested for contempt and jailed from July 8th through July 18, 1986.
On November 18, 1986, after a visit with her father, Chrissy was taken to the emergency room of the Hancock County Hospital. Following an examination of Chrissy, Dr. William Bradford filed a "Report of Suspected Battered Child" with the Hancock County Welfare Department. Dr. Bradford's report identified physical symptoms suggesting that Chrissy may have been sexually abused. A second doctor, pediatrician Bryant McCrary examined Chrissy on November 25, 1986. He filed a "Report of Suspected Battered Child" with the Welfare Department, stating that his findings were "very suspicious of child abuse."
On December 17, Foxworth filed a petition to transfer custody of Chrissy to him. He arranged to have Chrissy interviewed by psychologist Dr. Franklin Jones. On June 15, 1987, Singley filed a counterclaim, charging that Foxworth had sexually abused Chrissy, and seeking supervised visits between Foxworth and Chrissy.[2] Singley also requested that a guardian ad litem be appointed for Chrissy.[3] Singley arranged to have Chrissy examined by Dr. Catherine Meeks, a Gulfport psychologist, and on June 17, Dr. Meeks' deposition was taken. Foxworth continued to exercise his visitation rights between December 1986 through July of 1987.
Chancellor Dale held a hearing on the motions on June 22, 1987. On August 4, 1987, he issued his opinion, finding that "there is no credible evidence that Chrissy has been sexually abused or molested by Tim (Foxworth) or by any other person." The chancellor ordered custody transferred from Singley to Foxworth, with visitation rights granted to Singley. Foxworth and Singley agreed that Chrissy would be transferred on August 9, 1987, but Singley did not turn Chrissy over on the appointed day.
On August 10, 1987, Chrissy was taken by her mother to Children's Hospital in New Orleans, and was examined by Dr. Rebecca Russell. Dr. Russell stated in her evaluation that Chrissy had given her "an age appropriate history consistent with sexual molestation." Singley filed a motion in the chancery court for a new trial. Chancellor Dale denied the motion.
*208 Harrison noticed the deposition of Dr. Russell on August 18, 1987. On August 21, 1987, Foxworth obtained a protective order prohibiting the taking of Dr. Russell's deposition. Nevertheless, Harrison took the deposition on August 23, 1987.[4] Singley then filed a motion to reopen the custody hearing "for review of new evidence", namely, Dr. Russell's report.
In late August of 1987, Foxworth filed a petition for contempt against Singley, alleging that she had failed to turn Chrissy over to him pursuant to the chancellor's August 4th order. Singley's Answer asserted the affirmative defense of necessity. Singley also filed a second motion for appointment of a guardian ad litem for Chrissy, and a motion for recusal of Chancellor Dale.
Chancellor Dale held a hearing on Foxworth's petition on August 28, 1987. Singley did not appear at this hearing, having gone into hiding. The chancellor found Singley "in willful, flagrant, intentional and unlawful contempt of this Court" in refusing to deliver Chrissy to her father, and ordered that Singley be incarcerated in the Marion County Jail until she purged herself "to the satisfaction of this Court" that she would obey the court's August 4th order.
On October 7, 1987, the chancellor entered nunc pro tunc an order denying Singley's motions to reopen the case, to appoint a guardian ad litem, and for his own recusal.
Singley was admitted to Charity Hospital in New Orleans under an assumed name on October 14, 1987. She died of a brain aneurism later that day.
On December 5, 1987, Harrison's paralegal Gail Martin phoned Donna Medley, director of the San Francisco Victim Witness Assistance Program, from the San Francisco airport, where she was with Chrissy. On December 11, the San Francisco Department of Social Services filed a petition on Chrissy's behalf in the San Francisco Juvenile Court, charging that Chrissy would be at risk of abuse if she were returned to her father's custody. Judge Weinstein issued a detention order, placing Chrissy under the temporary custody of the Department of Social Services in Medley's home.
On December 15, 1987, Judge Dale issued an order directing District Attorney Douglas to obtain custody of Chrissy in San Francisco, and bring her back to Mississippi. On December 16, Judge Weinstein issued an order declining jurisdiction over Chrissy, and placing temporary custody of Chrissy with Douglas. On December 17, 1987, Douglas and Chrissy returned to Mississippi. Judge Dale issued an order finding it in Chrissy's best interest to have her examined "by competent professionals and under the direction of the Court" before Chrissy was returned to Foxworth. Judge Dale also ordered that the Youth Court Division of the Court oversee such proceedings, and that his August 4th order granting Foxworth custody of Chrissy be delayed until the Youth Court had finished its work.
Garland Upton, Marion County Youth Court Referee, appointed two public defenders as guardians ad litem for Chrissy in the Youth Court proceedings. On December 18, 1987, Judge Dale ordered that Chrissy be examined by physician Dr. Kimble Love and psychologist Dr. Franklin Jones, both of whom had previously examined Chrissy at Foxworth's request, and neither of whom had reported any finding of sexual abuse. After new reports by Jones and Love that there was no evidence suggesting that Chrissy had been sexually abused, Judge Dale placed Chrissy in the custody of her paternal grandmother Hathorn, with unlimited visitation by Foxworth. On December 23, 1987, Marion County social worker Lacy, who had visited Chrissy at the Hathorn home, recommended to Judge Dale that Chrissy should remain there.
On December 30, 1987, Upton held a Youth Court hearing, attended by Douglas, Judge Dale, the guardians ad litem, and Foxworth's attorney.
Upton recommended to the Chancery Court that the custody order be modified such that Chrissy remain in legal custody of *209 Foxworth, but cared for by Hathorn on a day-to-day basis. On December 31, 1987, Judge Dale modified his order to implement this recommendation.
On July 8, 1988, suit was brought in federal district court in Mississippi under 42 U.S.C. § 1983, alleging that various Mississippi officials were violating Chrissy's substantive and procedural due process rights, and rights under the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 et seq.
The district court, Chief William Barbour writing, issued an order on December 6, 1991, finding that Dale and Upton had deprived Chrissy of her right of access to the courts, and that Upton had denied Chrissy her 14th amendment due process rights. Judge Barbour ordered that Upton conduct new Youth Court proceedings regarding the allegations of sexual abuse.[5]

B. Newsom v. Newsom

Karen and Eugene Newsom were married in November of 1979, and divorced on grounds of irreconcilable differences in April of 1986. Karen was given custody of their children Katie (age 2) and Adam (age eight months), with Eugene given visitation rights.
On July 10, 1986, Karen petitioned to modify Eugene's visitation rights, alleging that he had physically abused Katie and Adam. On August 28, 1986, Eugene filed an answer, which he later amended to request that custody of the children be transferred to him.
Harrison states in her brief that during the period of July 1986 through February 1987, when Eugene exercised his visitation rights with Katie, Karen began to suspect that Katie was being sexually abused. Harrison states that Karen brought Katie to two local physicians, who confirmed that Katie exhibited symptoms of sexual abuse. At this point, Harrison states, Karen "unilaterally stopped all unsupervised visits with Eugene and the children ... of her own accord."
Attorney Erik Lowrey was appointed guardian ad litem for Katie and Adam on May 18, 1987. According to Harrison, Lowrey never met with the children, Karen or Eugene, and did not interview potential witnesses.
A trial was conducted before Chancellor Dale on July 23 and 24, 1987, in the Forrest County Chancery Court. Dr. McCrary, a pediatrician, and Dr. Meeks, a psychologist, testified to their conclusions that Katie had been sexually abused. The Chancellor entered his order on August 3, 1987, transferring custody of Adam and Katie to Eugene, and giving Karen visitation rights. The Chancellor found that there was no evidence that Eugene had abused the children, sexually or otherwise. The Chancellor's Memorandum Opinion stated in part:
The assertions by Karen, together with the supporting assertions by the expert witnesses, particularly Dr. McCrary, M.D. and Dr. Meeks, Ph.D., are expressions of suspicion and are, at best, their personal conclusions which are not supported by any factual basis. Indeed, the fervor exhibited by these persons to condemn and convict Gene with no more to sustain them than they (sic) present leads the Court to exclaim "shades of Old Salem"!
The children have been abused: Karen has subjected them to numerous unwarranted doctors visits/examinations, and especially is this applicable to Katy ...
Rather than turn Katie and Adam over to Eugene on August 9, 1987, the day set by the chancellor's order, Karen put the children into hiding. On August 11, 1987, Eugene petitioned the court to hold Karen in contempt *210 and incarcerate her for failure to comply with the court's August 3rd order.
Karen brought Katie to the Children's Hospital in New Orleans for examination on August 12, 1987. The examination allegedly revealed physical evidence consistent with sexual abuse.
In a contempt hearing held August 20, 1987, Karen refused to tell the court of Katie's and Adam's whereabouts. Karen stated that Harrison and Ducote had advised her to turn the children over. The chancellor found Karen in contempt of court and ordered her jailed on the next day.
Newsom remained in jail from August 21, 1987 through October 14, 1987. At some point during this period, Harrison ceased to be Karen's attorney.[6] Karen surrendered Katie and Adam to the court; by order dated October 14, 1987, her rights to visit them were severely restricted.
The Bar alleges that during the period of August 10 through early October, 1987, Harrison, co-counsel Richard Ducote, Gail Martin and members of Mothers Against Raping Children (MARC) "campaigned to publicize Karen's situation in the various forms of the media in an attempt to influence chancellor Dale and other public officials concerning Eugene's guilt of child abuse." Additionally, the Bar alleges that Harrison intentionally misinformed that court on September 16, 1987, that neither she nor her office staff knew Katie and Adam's whereabouts. Finally, the Bar alleges that Harrison asked or told Newsom and Dorrie Singley to give false statements to attorney J.R. Randall, including statements that Harrison did not know the children's location. Such statements, alleges the Bar, were prepared to protect Harrison from being found in contempt of court, were the chancellor to charge Harrison with knowing the children's location.
The chancellor ruled on post-trial motions on January 12, 1988, making permanent the restricted visitation imposed against Karen. This Court affirmed the chancellor in Newsom v. Newsom on February 14, 1990. See 557 So.2d 511 (Miss. 1990).

III.

COURSE OF BAR PROCEEDINGS
The Bar's Formal Complaint against Harrison arising from the Foxworth/Singley case, no. 90-B-127, was filed with the Clerk of the Supreme Court on February 2, 1990. Filed with the Clerk on February 6, 1990, was a copy of a "Summons" or "Notice To Respondent," delivered to the executive director of the Bar at the Bar office "for Garnett Harrison." The notice stated that Harrison was required to file a written response to the complaint with the Clerk of the Mississippi Supreme Court within twenty days, or be subject to judgment by default.[7]
On February 13, 1990, an order issued from this Court appointing a Complaint Tribunal to hear the Foxworth/Singley Complaint. The Tribunal consisted of Judges Larry E. Roberts and Patricia Wise, and attorney James Robertshaw, with Roberts designated Presiding Judge.
The Bar's Formal Complaint against Harrison arising from the Newsom case, no. 90-B-361, was filed on April 2, 1990. On April 4, 1990, this Court appointed a Complaint Tribunal to hear the Newsom Complaint, composed of the same members designated for hearing of the Foxworth/Singley Complaint.
A letter from Harrison to Michael Martz, counsel for the Bar, dated July 30, 1990, and stamped received by the Bar on August 2, 1990, reads in part:
Several months ago I forwarded to Mr. Micquel (Charles) the tape the Bar had furnished me concerning the hearings of Tim Foxworth & Bernice Singley in Jan *211 1988. The tape was inaudible and not transcribable.
Consider this a formal request for production of the tape  in transcribable quality. I am unable to conduct any meaningful discovery until I have listened to the tape. I maintain that I am entitled to have a record in accordance with due process.
Harrison provided the Bar with her address in Montpelier, Vermont.[8]
A letter dated from Martz to Harrison dated August 13, 1990, acknowledged receipt of the July 30th letter, and noted with respect to Harrison's request that "(a)s an attorney you are familiar with the proper form of a request for production of documents and/or material." The letter continued:
Nevertheless, upon review of the above-referenced files I notice that you have not executed an Acknowledgement of Receipt of Formal Complaint and Summons no entered an appearance in these cases. Is this an oversight? If so, please execute the enclosed Acknowledgments and return them to the Clerk of the Mississippi Supreme Court which will clarify the issue of whether or not you have entered an appearance in these cases.
For further clarification purposes, was it your intent to make an appearance for general purposes through the forwarding of your letter of July 30, 1990 to me? I am assuming that such is the case and am relying upon such assumption. Consequently, I am this date filing the original of your July 30, 1990 letter to me with the Clerk of the Mississippi Supreme Court with instructions to file such letter with the other pleadings already filed in Cause No. 90-B-361. If you do not file an Answer to this Formal Complaint as well as to Cause No. 90-B-27 (sic), I will review what procedures, if any, are available to the Mississippi State Bar in accordance with the Mississippi Rules of Civil Procedure which may include filing for a Clerk's Entry for Default and, if same, is entered by the Clerk, the subsequent filing of a Motion for a Default Judgment to be considered by the Complaint Tribunal assigned to consider Cause No. 90-B-361.
On August 31, 1990, Harrison executed an "Acknowledgment of Receipt of Summons and Formal Complaint, which was filed with the Supreme Court Clerk's Office on September 17, 1990. Also filed on that date was a Request For Production of Documents by Harrison, dated September 10, 1990, in which she asked the Bar to provide:
1. The cassette tape of audible quality in regard to the disciplinary Bar proceedings against me in this cause or transcription of said Hearing that occurred in January of 1988 which is the basis of this complaint
2. A copy of any and all documents herein that the Mississippi State Bar intends to introduce into evidence in its proceedings against me.
On September 28, 1990, a Second Request for Production of Documents was filed in the Clerk's Office, stating in part:
1. The Respondent would request that the Petitioner produce any and all exculpatory documents and information pertaining to the Respondent in this cause in the investigation of said complaint.
2. A list of all witnesses the Petitioner has spoken with in regard to said investigation of said complaint, including their names, addresses, and phone numbers.
3. Any and all witness statements, whether or not they will be utilized in said proceeding, in regard to the investigation of this case.
4. Any and all documents the Petitioner has received from any law enforcement, local, state, or federal, in regard to their investigation in this cause. *212 The Bar's Response to Harrison's first request for production of documents was filed October 12, 1990.[9] In regard to Harrison's request for the tape or transcript of the January 1988 hearing, the Bar stated that it would "produce the original of the cassette tape of the hearing that occurred in January, 1989, which serves as the basis of this Complaint." In regard to Harrison's request for documents that the Bar intended to introduce as evidence in its proceedings, the Bar stated "Will produce at the offices of the Complainant at a mutually agreeable time and place."
The Bar's response to Harrison's second request for production of documents was also filed October 12, 1990. In response to the request for "exculpatory documents," the Bar stated that it would produce them "at the offices of the Complainant at a mutually agreeable time and place." In response to the request for a witness list, the Bar objected, stating that this was an interrogatory, requiring preparation rather than production of a document. As to witness statements, the Bar stated that it would produce such statements "provided same are not privileged." As to documents from law enforcement agency documents, the Bar stated that it would produce any "of an exculpatory nature," but objected to the request as pertaining to any privileged documents.
On October 18, 1990, the Bar filed "Applications to Clerk for Entry of Default and Supporting Affidavits" in 90-B-127, the Singley/Foxworth case and in 90-B-361, the Newsom case. Copies of Harrison's Acknowledgments of Receipt of Summons and Formal Complaint were attached. On that day, a Docket Entry of Default was filed by the Clerk of the Supreme Court in each case.
On November 1, 1990, Harrison filed Motions to Set Aside Entry of Default, alleging:
The Respondent would show that said Motion to Set Aside Default (sic) entered herein against her should be set aside for just cause in that she has instituted discovery in said cause and has continually requested from the Complainant vital, necessary information, in order to prepare her defense to said cause. Respondent would show unto the Court that as early as December 1989 she requested herein a copy of said transcript or a tape of audible quality in regard to said hearings in January 1989, but to this date she has not been furnished same and that she cannot accurately respond to said complaint without said transcript.
Wherefore your Respondent prays that this, her Motion to Set Aside the Entry of Default be received and that this Court will set aside the Default entered herein against her, and would proceed with discovery herein.
Also filed November 1, 1990, was a letter from Harrison to Martz dated October 24, 1990, concerning the Bar's responses to her discovery requests in both the Singley/Foxworth and Newsom Complaints. The letter stated in part:
With regard to Request Number One within Cause Number 90-B-127, I would request that you copy all exculpatory documents and information pertaining to the investigation of said complaint. I see no point in setting a mutually agreeable time and place in that I am not coming to Mississippi. I do not have counsel available in Mississippi ...
I will be filing an interrogatory in regard to witnesses.
With regard to Request Number Three in my Second Request for Production of Documents in Cause Number 90-B-127, you state that you will produce these statements if they are not privileged. As I understand it, you are required to first identify any and all statements you may have in your possession, then state whether or not you are asserting a privilege, and further, state the basis of your privilege. I would request at this time that you provide me that necessary information so that I will not have to formally file a Motion to Compel ...
In regard to the cassette tape requested in my First Request for Production of Documents in Cause Number 90-B-127, I would request that you forward the tape to *213 me. I am not in a position to financially be able to return to Mississippi.
With regard to Request Number Two in my First Request for Production of Documents, I am requesting those documents be forwarded directly to me ...
I will be filing the necessary interrogatory in regard to Request Number Two in my Second Request for Production of Documents.
If I have not received these documents by November 15, then I will take the necessary action to file a Motion to Compel.
On November 5, 1990, the Bar filed Motions for Entry of Default Judgment and Supporting Affidavits, requesting that the Tribunal "enter such discipline as it deems appropriate." Also that day, the Bar filed notice that it would bring its Motions for Default Judgment for hearing before the Complaint Tribunal "as soon as counsel can be heard."
The next docket entries, dated August 23, 1991, are Notices of Hearing on Motions, referring to the Bar's Motion for Entry of Default Judgment and Harrison's Motion to Set Aside Clerk's Entry of Default. A hearing on the motions in both cases was noticed for September 13, 1991 at 10:00 a.m. at the Mississippi Bar Center.
On September 9, 1991, Harrison filed a motion to stay the Bar proceedings on the grounds that the § 1983 suit on behalf of Chrissy Foxworth was pending in the federal courts, and that:
said proceedings have relevance and are relevant to the outstanding Bar proceedings with regard to the Respondent and that justice would be served with this court granting a stay in regard to these proceedings until the federal court has rendered its opinion . ..
The motion noted that the federal suit had been tried the week of June 10, 1991, and had been the subject of two interlocutory appeals to the Fifth Circuit.
On September 13, 1991, the Complaint Tribunal met in Jackson to consider the two Formal Complaints.[10] Harrison neither attended nor sent counsel. The Bar's Proffers of Proof were entered into evidence in each case. Several exhibits were entered into evidence in each case.[11]
The Tribunal discussed a letter from Harrison addressed to Robertshaw dated September 6, 1991. The letter reiterated her contention the Tribunal's proceedings should be stayed pending the outcome of the federal Chrissy Foxworth suit. The letter stated in part:
I apologize for this letter form, but I simply do not have the time or staff to be able to adequately respond in motion form at this point. However, I did think a letter might be appropriate as a method to convey some undisputed facts ...
I have repeatedly requested, since as early of December of 1989, material and substantial discovery that is needed in order for me to effectuate my defense. I specifically am requesting a copy of the transcript or an audio tape of sufficient quality that it can be transcribed. I am attaching a copy of my December 11, 1989, letter with regard to my only answer to the Bar complaints rendered against me.[12] Without the transcript or a tape of transcribable quality, I cannot answer the complaint. *214 In addition to the tape or transcript, I have requested certain documents from the Mississippi State Bar ... (i)n their response, they said I could review the material at the Mississippi State Bar office. I am in the State of Vermont and have been in the State of Vermont since February of 1990. I do not have the money to travel south, which is approximately 1,500 to 2,000 miles. I do not own a car. I would request that I be forwarded an itemized account of how much the Xeroxing would be with regard to these documents. Perhaps at that time I could forward that amount in order to receive the documents ...
Should I receive the discovery material from the Mississippi State Bar, I expect I could formulate an answer in my own defense within sixty (60) days...
In closing, I would like the committee to take note that I have voluntarily selfsuspended myself from the practice of law beginning in March of 1988. I was unable to practice law at that time and remained unable to practice law until the late Fall of 1989. I was under doctor's care during that period of time and am most willing to furnish medical reports in that regard. I have furnished medical reports to Michael Martz in the past. In addition, I was also faced with a warrant for my arrest from March of 1988 until March of 1990 for civil contempt. This was based upon my failure to pay a Rule 11 sanction rendered against me in Forest (sic) county. The sanction was in the approximate amount of $5,000. I subsequently paid the court sanctions the latter part of 1988, but the circuit court refused to withdraw the arrest warrant until March of 1990. I was thus virtually barred from defending myself during this period of time as well ...
The letter also requested that the Tribunal consider "a bifurcated proceeding."
Counsel for the Bar brought this letter to the attention of the Tribunal; evidently he had received a copy. Robertshaw stated that he had yet not received it. The Tribunal determined that the letter was not material, relevant or admissible, and declined to read it.
The Tribunal discussed the exhibits, and had an off-the-record conference. Judge Roberts then announced that the Tribunal unanimously found sufficient evidence justifying disbarment.
On September 16, 1991, an Order and Default Judgment was entered in the Clerk's office against Harrison in each case. The Order stated in part:
(t)he Tribunal, being fully satisfied that Ms. Harrison has been served with a Summons and an attested copy of the Formal Complaint, that Ms. Harrison is not an infant, or an incompetent, that Ms. Harrison has failed to plead or otherwise defend, and that Ms. Harrison has been provided with a copy of the Motion for Default Judgment and Notice of the Hearing on said Motion, and being otherwise fully advised in the premises, is of the opinion and finds Ms. Harrison in default ...
Harrison's motions to stay and set aside clerk's entry of default were denied.
On November 14, 1991, the Tribunal entered its Opinion and Judgment against Harrison in both cases. The Tribunal found that Harrison had been served with process of both Complaints on August 31, 1990. In both Opinions, the Tribunal essentially adopted the Bar's allegations as its findings of fact. The Tribunal's conclusions of law in both cases held that Harrison had violated numerous Rules of Professional Conduct for the Bar, as well as the Mississippi's attorney's oath. Harrison was disbarred from the practice of law in both Judgments.[13]
On December 10, 1991, Harrison filed her notice of appeal to this Court. She provided an address in St. Augustine, Florida.
On April 8, 1992, Harrison filed a "Statement Pursuant to Rule 10 to Supplement the Transcript." The materials with which she wished to supplement the record included 1) the transcript of the January 4, 1989 Bar *215 investigatory hearings; 2) transcripts of hearings in the Newsom case; 3) the "initial complaint filed by the Mississippi State Bar ... in reference to the Respondent disability in 1988." On May 6, 1992, Judge Roberts denied the motion, on the grounds that 1) none of the requested items had been admitted in evidence during the trial on September 13, 1991; 2) none of the items had been considered by the Tribunal members in making a decision on the entry of default judgment or imposition of discipline; 3) Harrison had never filed an answer in either cause, nor appeared before the Tribunal.

IV.

DISCUSSION OF ISSUES

A. WHETHER OR NOT THE COMPLAINT TRIBUNAL IMPROPERLY GRANTED THE MISSISSIPPI STATE BAR MOTION FOR DEFAULT JUDGMENT OF DISBARMENT.
Harrison contends that the Tribunal improperly granted the Bar's Motion for Default on September 13, 1991, because she had "in fact answered said Complaint on September 6, 1991." Harrison asserts that her letter dated September 6, 1991, addressed to Judge James Robertshaw (and apparently received, though not read, by him the morning of the hearing) constituted an answer under the Mississippi Rules of Civil Procedure. Harrison attached to this letter a copy of her December 11, 1989, letter to Michael Martz, in which she provided explanations for some of the Bar's charges in the Foxworth and Singley complaints, and requested further information about other charges.
Harrison advises that the letter was "identified with the proper cause number, and signed by (her)," and contends that she answered the Bar "the best that she was able to in December of 1989 and September of 1991" (emphasis in original). Harrison cites Rule 8(f) of the Mississippi Rules of Civil Procedure for the proposition that "(a)ll pleadings shall be so construed as to do substantial justice." She contends that in addition to filing her "answer," she instituted discovery proceedings in both cases by requesting documents from the bar, thus filing a "responsive pleading."
The Bar contends that the Tribunal properly granted the Motions for Default Judgment, since no answers or other responsive pleadings were filed in response to the Complaints. The Bar states that Harrison's letter to Judge Robertshaw does not qualify as an answer under the Mississippi Rules of Civil Procedure, nor do the discovery requests qualify as responsive pleadings. The Bar adds that if Harrison felt she did not have enough information to answer the charges in the Formal Complaints, she could have filed a Rule 12(e) Motion for More Definite Statement.
All bar disciplinary matters are governed by the Rules of Discipline for the Mississippi State Bar, subject to federal and state constitutions. See Rule 1, Rules of Discipline; Mississippi State Bar v. Attorney L., 511 So.2d 119, 122 (Miss. 1987); Vining v. Mississippi State Bar, 508 So.2d 1047, 1048 (Miss. 1987). Bar disciplinary proceedings are also, to a limited extent, within the scope of the Mississippi Rules of Civil Procedure. In "proceedings pertaining to the disciplining of attorneys," the Rules of Civil Procedure supplement the Rules of Discipline where the Rules of Discipline are silent. See MRCP 81(a)(2); Attorney L., 511 So.2d at 122; Vining, 508 So.2d at 1048.
The Rules of Discipline contain no provisions concerning default judgments. Therefore, the Rules of Civil Procedure concerning default judgments apply to disciplinary proceedings. See Terrell v. Mississippi State Bar, 635 So.2d 1377 (Miss. 1994); Fougerousse v. Mississippi State Bar Assn., 563 So.2d 1363, 1365 (Miss. 1990); Barfield v. Mississippi State Bar Ass'n, 547 So.2d 46, 49 (Miss. 1989); Vining, supra.
Rule 55 of the Mississippi Rules of Civil Procedure provides in part:
(a) Entry. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his default.

*216 (b) Judgment. In all cases the party entitled to a judgment by default shall apply to the court therefor. If the party against whom judgment by default has appeared in the action, he (or if appearing by representative, his representative) shall be served with written notice of the application for judgment at least three days prior to the hearing of such application; however, judgment by default may be entered by the court on the day the case is set for trial without such three days' notice...
(emphasis added). A default judgment is proper only where a party "has failed to plead or otherwise defend" against the complaint. At issue, therefore, is whether Harrison did, or did not, "plead or otherwise defend" against the Bar's Formal Complaints.
The Rules of Discipline do not elaborate on what constitutes an attorney's "answer" under Rule 8.4. Therefore, we look to the Rules of Civil Procedure for direction. The Rules of Procedure do not define "answer," but as an attorney in a disciplinary proceeding is a defendant, the Rules pertaining to pleading of defenses would seem most relevant. M.R.C.P. 8 provides in part:
(b) Defenses: Form of Denials. A party shall state in short and plain terms his defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies. If he is without knowledge or information sufficient to form a belief as to the truth of an averment, he shall so state and this has the effect of a denial. Denials shall fairly meet the substance of the averments denied.
Rule 12, concerning Defenses and Objections provides in part:
(b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim shall be asserted in the responsive pleading thereto if one is required ...
An attorney's answer filed in response to a Formal Complaint should conform generally to the above Rules.
Rule 8.4 further provides that an attorney's answer "shall be filed within twenty (20) days after a copy of the Formal Complaint is served." While the rule does not specifically state that the answer be filed with the Clerk of the Supreme Court (as opposed to, say, being mailed directly to a Tribunal member), it may safely be inferred that such filing is required from Rule 8(a), which states that "(a)ll formal complaints shall be filed with the Clerk of the Court."
The Foxworth/Singley and Newsom Formal Complaints were filed in the Clerk's office on February 2 and April 2, 1990, respectively. Harrison executed her two Acknowledgments of Receipt of Summons and Formal Complaint on August 31, 1990; the Complaint Tribunal found that Harrison was served on that date. Therefore, under Rule 8.4, her answers were due on August 20, 1990.
Harrison contends that her September 6th missive to Robertshaw constituted an "answer." However, the letter was 1) not in the form of an answer, as envisioned by Chapter III of the M.R.C.P.; 2) not filed with the Clerk of the Court, as required by Rule of Discipline 8, and 3) not filed within the twenty day period required by Rule of Discipline 8.3. Therefore, sending the letter directly to Robertshaw did not meet the requirement in M.R.C.P. 55 that the party against whom default is sought "plead" in response to the complaint.
Nor did Harrison's "Requests for Productions of Documents," filed on September 17 and September 28, 1990, conform to the "pleading" requirement of Rule 55. Discovery requests are not "pleadings" as that term is discussed and defined in Chapter III of the M.R.C.P., "Pleadings and Motions."
Finally, neither the letter to Robertshaw nor the discovery requests conform to the alternative to pleading in Rule 55(a), "otherwise defend." The Comment to Rule 55 elaborates on the meaning of "plead or otherwise defend" referenced in section (a) of the Rule:
The words "otherwise defend" refer to the interposition of various challenges to such matters as service, venue, and the sufficiency of the prior pleading, any of which might prevent a default if pursued in the absence of a responsive pleading. The *217 authority in Rule 55(a) for the clerk to enter a default does not require that to escape default the defendant must not only file a sufficient answer but must also have a lawyer or be present in court when the case is called for trial; thus a motion challenging the complaint for failure to state a claim upon which relief can be granted is within the notion of "otherwise defend."
The words "otherwise defend" in Rule 55(a) appear to envision a motion under Rule 12(b). Although the outer limits of the concept "otherwise defend" are not defined in the Rule or the Comment, discovery requests and letters to judges do not fit within even a strained construction of the words.[14]
In sum, Harrison's contention that her letter and discovery requests were an "answer" or "responsive pleadings," sufficient to render the default judgment improper, is without merit.
The Bar complied with all procedural requirements of Rule 55. On October 18, 1990, the Bar applied to the Clerk for an entry of default, submitting the required affidavit. Satisfied that Harrison had failed to plead or otherwise defend the suit, the Clerk entered the default that day. Harrison then properly filed a Motion to Set Aside Entry of Default on November 1, 1990. On November 5, 1990, the Bar applied to the Court for an entry of default judgment. The Bar also filed notice that it would bring the motion for hearing "as soon as counsel can be heard." Under Rule 55(b), because Harrison had "appeared in the action," she was entitled to written notice three days prior to such hearing. On August 23, 1991, a hearing was noticed for September 13, 1991  giving Harrison twenty-one days notice. Harrison chose neither to attend the hearing, nor to send a representative.
Harrison's case may be compared with that of the defendant in Barfield v. Mississippi State Bar Association, 547 So.2d 46 (Miss. 1989). Barfield signed an acknowledgment of receipt of summons and formal complaint on June 23, 1987. He requested an enlargement of time, partly on the basis that the complaint had been served on him "without certain exhibits." However, Barfield never filed an answer. The Bar obtained an entry of default forty days later, and on September 21, 1987, filed a motion for entry of default judgment, and noticed a hearing for October 5, 1987. The hearing was held before a Complaint Tribunal on October 5, 1987, and Barfield did not appear. Counsel for the Bar stated to the Tribunal that on October 2, 1987, he had received a letter from Barfield acknowledging receipt of the motion for entry of default. The Tribunal took the allegations in the formal complaint as confessed, stating:
It is the opinion of the tribunal that this last minute request is an attempt by Mr. Barfield to delay and otherwise confound the proceedings of the Tribunal.
Barfield, 547 So.2d at 49. The Tribunal entered a default judgment, disbarring Barfield. He appealed, claiming that the default had been in error because he had "manifested every intention to respond to the charges" at the time the default was entered. This Court rejected Barfield's argument, noting that he had acknowledged service of process, had been given extra time to file his answer, and had notice of the hearing, yet filed no answer, and made no appearance. See also Vining, supra. (default judgment may be granted in attorney disciplinary proceeding, where formal complaint had been received, waiver of service of process and entry of appearance filed, no answer or any other responsive pleading filed).
Similarly, Harrison acknowledged service of process, had approximately a year in which to file an answer, and had notice of the hearing on the Bar's motion for default judgment; *218 yet filed no answer, and made no appearance.[15]
In sum, the Tribunal did not improperly grant the Bar's Motions for Default on September 13, 1991.

B. WHETHER THE MISSISSIPPI STATE BAR AND THE COMPLAINT TRIBUNAL VIOLATED HARRISON'S CONSTITUTIONAL RIGHTS, INCLUDING:
1. THE RIGHT TO DUE PROCESS OF LAW GUARANTEED UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND THE MISSISSIPPI CONSTITUTION OF 1890; ARTICLE III, SECTION 14.
2. THE RIGHT TO EQUAL PROTECTION OF THE LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

1. Due Process

Harrison contends that the Bar and the Tribunal violated her due process rights under the federal and state constitutions by 1) failing to comply with her discovery requests; 2) not furnishing documents utilized in the prosecution against her, while introducing these documents at the Complaint Tribunal hearing, and 3) proceeding against her at a time when she was impaired, disabled and unable to defend herself.
Harrison also appears to have alleged some sort of notice problem. Presumably referring the Formal Complaints against her, she asks:
Which tribunals did she allegedly lie to? What did Harrison allegedly lie about? What conduct did she engage in that disrupted the Tribunal? Which court orders did she violate? In which way did she violate them? When did she do it?
The Bar agrees that Harrison was entitled to due process, but challenges her assertion that it failed to respond to her discovery requests.
This Court has held that bar disciplinary matters are of a "quasi-criminal nature." Mississippi State Bar v. Attorney L., 511 So.2d 119, 121 (Miss. 1987); Mississippi State Bar v. Young, 509 So.2d 210, 212 (Miss. 1987); Attorney K. v. Mississippi State Bar Association, 491 So.2d 220, 222 (Miss. 1986). Accordingly, attorneys accused in such matters are entitled to due process of law under U.S. Const.Amend 14, § 1 and Miss. Const. Art. 3, § 14. Attorney L., 511 So.2d at 122; Attorney K., 491 So.2d at 222; Myers v. Mississippi State Bar, 480 So.2d 1080, 1087 (Miss. 1985); Netterville v. Mississippi State Bar, 397 So.2d 878, 883-84 (Miss. 1981). In reviewing bar disciplinary proceedings, this Court has held that due process "demands that the proceedings be conducted with regard to the attorney's rights of notice and opportunity to be heard." Netterville, 397 So.2d at 883, citing Mississippi State Bar v. Attorney-Respondent, etc., 367 So.2d 179 (Miss. 1979). See also In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); Myers, 480 So.2d at 1087; A Mississippi Atty. v. Mississippi State Bar, 453 So.2d 1023 (Miss. 1984). In Netterville, the Court held that an attorney subject to a complaint investigation is entitled to 1) confrontation and cross-examination of his accusors; 2) offering witnesses on his own behalf; and 3) proof of the charges against him by clear and convincing evidence. See also Terrell v. Mississippi Bar, 635 So.2d 1377 (Miss. 1994).
In light of these holdings, we examine Harrison's claims that she was denied due process by the Bar and the Complaint Tribunal.
It is unclear exactly when Harrison was sent and received the Formal Complaints against her. However, it is uncontested that she executed the Acknowledgment of Receipt of Summons and Formal Complaints on August 31, 1990. Harrison was thereafter *219 charged with "notice" of the charges against her. As discussed, Harrison did not file answers to the complaints. Instead, she filed two discovery requests.
The Bar's responses to these requests were less than fully cooperative. The Bar stated that it would produce documents that it intended to introduce into evidence against her and "exculpatory documents" at its offices "at a mutually agreeable time and place." The Bar did not provide the "witness list" Harrison had requested, stating that such a list was properly an interrogatory, requiring preparation, rather than production of a document. Finally, the Bar stated that it would provide the witness statements and documents from law enforcement agencies she requested if such documents were not privileged; although it did not specify, presumably the Bar intended to produce such documents at its office, at a mutually agreeable time and place. The Bar stated that it would, and later did provide Harrison with a tape of the Foxworth/Singley investigatory hearing, although she claims this tape is inaudible.
While the Bar's responses to Harrison's discovery requests were not ideal from her point of view, the Bar is correct in its argument that such responses were permissible under the M.R.C.P. There is no authority that the Bar is obliged to provide an attorney subject to discipline transcripts of investigatory hearings. Therefore, while an audible tape might prove more useful to Harrison than the one she has, the Bar cannot be said to have failed an obligation under the rules of discovery or the Rules of Discipline. The response to Harrison's request for a witness list was, perhaps, disingenuous; the Bar could have provided the list without waiting for an interrogatory. Nevertheless, Harrison did not submit an appropriate interrogatory; in its absence, the Bar was under no obligation to provide the list.
As to witness statements, "exculpatory documents," and documents from law enforcement agencies, the Bar's response that it would make such documents available for inspection at a mutually agreeable time and place may not have been helpful to Harrison. However, there is no authority that the Bar was required to forward all materials requested by Harrison to her. Rule 34(a) of the M.R.C.P. states in part:
(a) Scope. Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents ...
(b) Procedure. () The request shall set forth the items to be inspected either by individual item or by category, and describe each item and category with reasonable particularity. The request shall specify a reasonable time, place and manner of making the inspection and performing the related acts ...
The Rule does not require the party receiving a discovery request to deliver the requested materials to the opposing party, merely to make such materials available for inspection.[16]
At any rate, M.R.C.P. 37 provides recourse where one party fails to respond to a discovery request. Rule 37 provides in part:
if a party, in response to a request for inspection submitted under Rule 34, fails to respond that inspection will be permitted as requested, the discovering party may move for an order compelling inspection in accordance with the request.
That Harrison was aware of this option  a motion to compel  is evident from her letter of November 1, 1990. However, she never availed herself of this procedure. It is apparent that with regard to discovery, the Bar successfully shifted the burden back to Harrison, in a fashion consistent with the M.R.C.P.
Perhaps more importantly, the question arises of whether the Bar's "failure" to produce (and send to her) transcripts and other documents requested by Harrison is a viable defense to her failure to file answers to the Bar's Formal Complaints. That is, even viewing the Bar's responses to Harrison's *220 Requests for Production of Documents in the worst light, did such "stonewalling" truly prevent Harrison from responding to the charges articulated in the Formal Complaints?
The Complaint arising from the Foxworth/Singley case identifies the Rules which Harrison allegedly violated, and references later paragraphs in which the charges, and her specific acts, are elaborated. For example, Section IV A. of the Complaint charges that Harrison had violated:
Rule 1.15(b) which provides that when a lawyer receives property belonging to a client or in which a third person has an interest, he shall promptly deliver to the client or third person the property that the client or third person is entitled to receive, as is more fully explained her in paragraphs XXI through XXVI;
Paragraphs XXI through XXVI contain a narration of the events the Bar alleges took place concerning Dorrie Lynn Singley's diary after her death. The Bar alleges that Harrison's office manager, Gail Martin, retrieved the diary from Bernice Singley (Dorrie Lynn's grandmother) and brought it to Harrison's office. The Bar further alleges that Harrison later retrieved a copy of the diary from Bernice Singley, and told her that it had been subpoenaed. The Bar charges that Martin told Bernice Singley to deny knowledge of the diary if asked about it. The Bar further charges that Harrison later wrote to Bernice Singley, admitting knowledge of the diary, and attached this letter as an exhibit. The Bar charges in paragraphs XXVI and XXVII that Harrison also violated Rule 1.15(b) by failing to deliver to Bernice Singley a trailer which belonged to her.
Harrison's letter of December 11, 1989, to Martz (which she later attached to her September 6, 1991, letter to Robertshaw) states that she had reviewed the investigatory reports in the Singley and Foxworth complaints. She then proceeds, in an orderly fashion, to address the numerous rules which the reports alleged she had violated. In particular, Harrison addressed the alleged violations of Rule 1.15(b), and explained concerning the diary:
With regard to the portion of this complaint related to Dorrie' Singley's journal, I presented a copy of that journal to my counsel of record, Ms. Ellen Yaroshevsky, who, in turn, filed it with Judge Dale in open court in November or December 1987. That journal, on information and belief, is public record and readily available to Bernice Singley. I have also been informed that Bernice Singley was personally given a copy of the journal in January, 1988.
Clearly, there is sufficient information in Harrison's letter of December 11, 1989, to formulate an answer to the Formal Complaint's charges concerning the diary and the trailer. That is, a person armed with the facts in the December 11th letter  and this may fairly be said to include Harrison herself  could have articulated an answer or "responsive pleading" and filed it with the Clerk's office sometime after August 31, 1990. Instead, Harrison continued to write directly to the Bar, requesting documents, and asserting that she could not ascertain the charges against her.
Moreover, an examination of the Complaints with their attached exhibits refutes Harrison's contention that the transcripts she requested, but the Bar refused to provide, were "introduced ... at the Complaint Tribunal hearing." The Complaint in the Foxworth/Singley case does not contain transcripts of November 9 and December 9, 1987, hearings, as alleged by Harrison in her brief. The Complaint in the Newsom case does contain a transcript of the August 20, 1987, hearing, but does not contain the other transcripts she alleges (September 9, 1987; September 16, 1987; December 1, 1987, and December 29, 1987). Nothing  the Bar or otherwise  prevented Harrison from contacting the Clerk's office concerning the Complaint and the transcript (assuming she did not receive it with her Complaint).
In sum, Harrison had sufficient notice of the charges against her, despite her continuing assertion that she was unable to formulate an answer without the various documents she requested from the bar  documents, it might be added, that the Bar had *221 no obligation to forward to her as she contends.
It may be noted that over six weeks elapsed between the date of service on Harrison (August 31, 1990) and the Bar's application to the clerk for an entry of default (October 18, 1990). This period was Harrison's "window" in which to file an answer  her basic "opportunity to be heard." She declined to take it. When informed of the Clerk's entry of default, Harrison filed a motion to set aside the entry of default  but apparently never sought a hearing on the motion. Such hearing would have provided another opportunity to be heard. Again, she declined to take it. Harrison received notice of the September 13, 1991, hearing on the Bar's motion for Default Judgment and her own motion to set aside the entry of default. Such hearing was, of course, another opportunity to explain her side of the story, present witnesses, or question the Bar about the charges against her. Yet again, she declined to take it.
Further, there were no surprises at the Tribunal hearing. The Bar's Proffer in the Newsom case did not differ from the Formal Complaint. The Bar's proffer in the Singley/Foxworth Complaint contained one minor additional charge and document not contained in the Formal Complaint, but was otherwise the same as the Complaint.[17] The one document introduced into evidence at the hearing, which arguably should not have been introduced because neither Complaint alluded to it in any way, was a May 1989 Bar admonition against Harrison.
With the exception of this one document, Harrison was provided with notice of the charges against her, and notice of all steps in the disciplinary process. Opportunity to be heard existed throughout the proceedings, but Harrison did not avail herself of it. In light of her failure to answer the Complaints against her, failure to pursue the discovery process, and failure to appear before the Tribunal, we cannot help but find that Harrison deprived herself of the opportunity to be heard considered essential to due process under state and federal law. Neither the Bar, nor the Tribunal, played any part in such deprivation.

2. Equal Protection

Besides alleging violations of her due process rights under the federal and state constitutions, Harrison also alleges a violation of her equal protection rights. Specifically, Harrison asserts that:
there has been disparate treatment against her from the outset, because she is female in that the issues of child sexual abuse that arose out of the Newsom and Singley/Foxworth cases are perceived as feminist or female issues.
The Bar states that these allegations are without support, and asks the Court to sanction Harrison in accordance with M.R.C.P. 11 and Supreme Court Rule 38 "for making such a frivolous, non-meritorious and irresponsible accusation in this appeal."
The Bar is correct in noting that Harrison's allegations concerning any violation of her equal protection rights are without support. Parties have an affirmative duty to provide support for their assignment of error. Roberson v. State, 595 So.2d 1310, 1318 (Miss. 1992); R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1023 (Miss. 1990). Nonetheless, we decline to impose sanctions pursuant to M.R.C.P. 11 or Supreme Court Rule 38.

C. WHETHER THE COMPLAINT TRIBUNAL IMPROPERLY IMPOSED THE SANCTION OF DISBARMENT AGAINST HARRISON IN VIOLATION OF THE ABA STANDARDS FOR IMPOSING SANCTIONS ON LAWYERS.
In support of her contention that disbarment was improperly imposed upon her, Harrison states that while most disbarments are based on theft from a client, negligence, or mishandling of a case, she neither committed nor was charged with any of these offenses. Harrison also calls our attention to *222 the fact that she has not been charged with any crimes.
Harrison urges this Court to apply the ABA Standards for Imposing Lawyer Sanctions, and contends that under these standards, disbarment was not proper. She cites ABA Standard 6.21 for the proposition that disbarment is only appropriate where the lawyer violates an order of the court with the intent to benefit himself or another; she argues that she had no such intent.
The Bar argues that Harrison violated duties to her clients, the public, the Court, and the legal profession, and that "only disbarment will preserve the dignity and reputation of the profession."
Rule 9.4 of the Rules of Discipline provides that on appeal, this Court "shall review the entire record and the findings and conclusions of the Tribunal, and shall render such orders as the Court may find appropriate." See Underwood v. Mississippi Bar, 618 So.2d 64, 67 (Miss. 1993); Foote v. Mississippi State Bar Association, 517 So.2d 561, 564 (Miss. 1987). This Court's review of the evidence is de novo; it sits as a trier of fact and is not bound by a substantial evidence or manifest error rule. Mississippi Bar v. Mathis, 620 So.2d 1213, 1219 (Miss. 1993); Underwood, 618 So.2d at 67; Foote, 517 So.2d at 564. Punishment for any violation of the Rules of Discipline is considered and imposed on a case-by-case basis, and is not governed by a set standard. Mathis, 620 So.2d at 1219; Underwood, 618 So.2d at 67; Vining v. Mississippi Bar Association, 508 So.2d 1047, 1049 (Miss. 1987). This Court may impose sanctions either more or less severe than the Complaint Tribunal. Broome v. Mississippi Bar, 603 So.2d 349, 353 (Miss. 1992); Mississippi State Bar v. Strickland, 492 So.2d 567 (Miss. 1986).
When reviewing sanctions for misconduct, this Court considers:
(1) Nature of the misconduct involved;
(2) Need to deter similar misconduct;
(3) Preservation of dignity and reputation of the legal profession;
(4) Protection of the public; and
(5) Sanctions imposed in similar cases.
Stegall v. Mississippi Bar, 618 So.2d 1291, 1294 (Miss. 1993); Culpepper v. Mississippi State Bar, 588 So.2d 413, 420 (Miss. 1991); Steighner v. Mississippi State Bar, 548 So.2d 1294, 1297-8 (Miss. 1989). In addition, we consult the ABA Standards for Imposing Lawyer Sanctions, inasmuch as the Standards "present helpful guidelines." Stegall, 618 So.2d at 1295. See also Mississippi State Bar v. Blackmon, 600 So.2d 166, 173 (Miss. 1992). The ABA Standard 3.0 states that in imposing sanctions, a court should consider:
(1) the duty violated;
(2) the lawyer's mental state;
(3) the potential or actual injury caused by the lawyer's misconduct; and
(4) the existence of aggravating or mitigating factors.
We now address the findings of the Tribunal in each case, and the Rules of Discipline which Harrison was found to have committed, to determine if disbarment was the proper sanction.[18] Harrison's responses to several of the charges (drawn from her briefs) are noted.

1. Foxworth/Singley

The Tribunal found that Harrison advised Singley to defy Judge Dale's August 4, 1987 order, and aided Singley in hiding Chrissy from Foxworth. This violated Rule 3.4(a, b & c), which provide that a lawyer shall not:
(a) unlawfully obstruct another party's access to evidence ... A lawyer shall not counsel or assist another person to do any such act;
(b) falsify evidence, counsel or assist a witness to testify falsely ...
(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists ...
*223 The Tribunal found that Harrison failed to supervise the activities of her employee Gail Martin, who also allegedly hid Chrissy, and subsequently ratified Martin's conduct. This violated Rule 5.3(b), which provides that with respect to a nonlawyer employed or retained by or associated with a lawyer:
(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer.
The Tribunal found that Harrison knew where Chrissy was located from approximately August 4, 1987, to approximately October 13, 1987, and by whom she was being held, but failed or refused to disclose this information to the court or Foxworth. This violated Rule 3.3(a)(1 and 2), which provide:
(a) a lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal;
(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.
This also violated Rule 4.1, which provides that in the course of representing a client a lawyer shall not knowingly:
(a) make a false statement of material fact or law to a third person; or
(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.
The Tribunal found that on August 23, 1987, Harrison had taken the deposition of Dr. Russell, in violation of Judge Dale's protective order specifically prohibiting the taking of such deposition. This violated Rule 3.5(c), which provides that a lawyer shall not engage in conduct intended to disrupt a tribunal.
The Tribunal found that Harrison had obtained Dorrie Singley's diary from Bernice Singley, and had not returned it to her, despite a request by Bernice Singley's new lawyer. Additionally, the Tribunal found that Harrison had failed to promptly deliver to Bernice a travel trailer belonging to her (Bernice) in Harrison's possession. This violated Rule 1.15(b), which provides:
Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive ...
The Tribunal found that Harrison had, while still representing Dorrie Singley's estate, entered into a contract with a movie production company for the rights to "The Garnett Harrison Story," which was to include a section on Harrison's representation of Dorrie Lynn Singley. This violated Rule 1.8(d), which provides:
(d) Prior to the conclusion or representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation.
The Tribunal found that Harrison had cooperated with a number of individuals who had aided Singley in her refusal to obey the Order transferring custody of Chrissy to Foxworth, and in aiding Singley from being apprehended and incarcerated in contempt of court. This conduct, in addition to the above acts, violated Rule 8.4, which provides:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so thought the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice.
Finally, all such conduct violated Miss. Code Ann. (1972) § 73-3-35, the attorney's oath, which requires the attorney to:

*224 demean himself ... with all good fidelity as well to the court as to the client ... (and) to use no falsehood or delay any person's cause for lucre or malice ...
Harrison states in her brief that she advised Singley of her obligations to obey the August 4, 1987, court order; that she has never advised a client to disobey a court order; that she did not instruct Singley to lie at her interview with James Randall; that she did not know the whereabouts of Chrissy; and that she did not know that Chrissy had been taken to California until informed by the media. Harrison admits to have taken the sworn statement of Dr. Russell; she asserts that Judge Dale "had no authority to prevent her from taking a sworn statement of her own witness in whatever form she might choose." She further explains:
Harrison construed Judge Dale's ex parte order, to mean that she could not compel counsel for the opposing party to attend and participate in the deposition. Technically, the sworn statement of her own court witness before a court reporter could not be considered a deposition for purposes of the Mississippi Rules of Civil Procedure.
Harrison provided some responses to the Bar's charges in the Singley/Foxworth complaints in her December 11, 1989 letter to Michael Martz. These responses are summarized and discussed below, although we note that the letter was not accepted into evidence by the Tribunal, and is not properly part of the record.
As to the Rule 1.8(d) violation, concerning the option contract, Harrison states:
The contract was for my life story, not that of my client. The title of the story was "The Garnett Harrison Story" and it was my understanding that the events surrounding Dorrie Singley's case were to constitute only a small portion of the story. I did not intend to violate this rule.
The contract with Tena Clark and Willette Klausner was signed by Harrison and dated November 25, 1987. The first paragraph of the contract stated:
This letter will confirm our understanding and agreement with regard to our (hereinafter "Clark/Klausner") optioning the rights to your life story (including but not limited to the founding of Mothers Against Raping Children (MARC) and the Dorrie Singley case ...
Harrison's compensation was $10,000. The contract further provided that Harrison was to obtain written permission and releases from Dorrie Singley and her family. The record contains a "Permission and Release" dated November 12, 1987, and signed by "Bernice Singley, Administratrix." Harrison had withdrawn as attorney of record for Dorrie Singley on October 26, 1987, owing to her death on October 14, 1987. However, it appears that Harrison represented the estate of Dorrie Singley for at least a few months subsequent, beginning with the preparation of a Petition for Letters of Administration for Bernice Singley. A letter to Harrison dated January 18, 1988 from Chester Nicholson, Bernice Singley's new counsel, notes that "a hearing has been set on your Motion to Withdraw before Jason Floyd on January 28, 1988."[19] Therefore, at the time Harrison signed the option contract, received $10,000 from Clark/Klausner, and pursued Bernice Singley's release, she was still representing Dorrie Singley's estate. We hold that such conduct is a violation within the scope of Rule 1.8(d).
As to the 1.15(b) violations, arising from the failure to promptly return to Bernice Singley the trailer in her possession, Harrison asserts that Dorrie Singley had tendered the trailer to her as partial payment of the $11,000 she owed to Harrison in legal fees. Harrison states that Bernice Singley did not say anything about the trailer until some time after Dorrie's death, and it was not until then that she (Harrison) learned that title to the trailer was in Bernice's name. She further explains:
I intended to return it to her and believed that I had left instructions for the trailer to be delivered to her but apparently I either was mistaken in that belief or else I failed to see that it was done. *225 The only explanation that I have for the delay in getting the trailer to Mrs. Singley is that I was severely disoriented and disabled during that entire time ...
As to the Rule 1.15(b) violation pertaining to Dorrie Singley's diary, Harrison states:
I presented a copy of that journal to my counsel of record, Ms. Ellen Yaroshevsky, who in turn, filed it with Judge Dale in open Court in November or December, 1987. That journal, on information and belief, is public record and readily available to Bernice Singley. I have also been informed that Bernice Singley was personally given a copy of the journal in January, 1988.
Harrison does not address the whereabouts of the original diary; she does not deny having had it at one point, nor keeping it despite a request from Bernice Singley's new counsel in January of 1988.
As to the Rule 3.4(c) violation pertaining to the taking of Dr. Russel's deposition, Harrison offered the same explanation in the December 11, 1989 letter, as quoted above from her brief, namely, that the Judge had no authority to prevent her from taking the sworn statement of her own witness.

2. Newsom

The Tribunal found that Harrison and her employee Gail Martin advised Karen Newsom not to deliver Katie and Adam to Eugene as ordered by Judge Dale; that Harrison advised Karen to go into hiding, and to secrete the children; and that Harrison assisted Don and Lydia Rayner in hiding Katie and Adam. This violated Rule 3.4(b), above.
The Tribunal found that because Martin was Harrison's employee, and Martin participated in the hiding of the children, Harrison had violated Rule 5.3(b), above, and Rule 5.3(c), which provides:
a lawyer shall be responsible for conduct of (a nonlawyer) that would be a violation of the rules of professional conduct if engaged in by a lawyer if:
(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved ...
The Tribunal found that Harrison knew the children's location, but did not disclose it to the court, Eugene Newsom, or his lawyer. This violated Rule 3.3(a)(1, 2, and 4), above, and Rule 4.1, above.
The Tribunal found that Harrison was present when Karen testified that no one, including Harrison, knew where the children were, and that Harrison did not disclose the falsity of this statement, thus aiding Karen in the commission of a fraudulent act. This violated Rule 3.4(b), above.
The Tribunal found that Harrison conducted a campaign to publicize Karen's situation, to try and influence Chancellor Dale. In particular, it found that she (1) played a tape, for the media and general public, of an interview with a doctor concerning Katie, when such tape was not admitted into evidence, and (2) participated in a publicity campaign to discredit Eugene Newsom and Chancellor Dale by disseminating medical and psychological reports of Katie to "every chapter of the Junior Auxiliary Association." This conduct violated Rule 3.5(c), above, and Rule 3.6, which provides in part:
(a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.
The Tribunal found that Harrison intentionally misinformed the court that neither she nor her staff knew where the Newsom children were. This violated Rule 3.3(a)(1, 2 & 4), above.
The Tribunal found that Harrison asked or instructed Karen to give a false statement to J.R. Randall, for the purpose of protecting Harrison from being found in contempt of court. This violated Rule 3.4(b), above.
The Tribunal found that Harrison consistently advised Karen to disobey the court order, and aided Karen and others in hiding the children. This violated Rule 8.4(a, c & d), above, and the attorney's oath, above.
In her brief, Harrison states that she advised Karen Newsom that she must obey the *226 court order; that she did not know where the Newsom children were after Karen put them into hiding; that she did not assist the Rayners in hiding the children; that she did not advise Karen to lie in her statement to Randall; that she did not advise Karen to lie at the August 20, 1987 hearing; that she did not know what her staff knew concerning the whereabouts of the children; that she does not recall authorizing the showing of the (video) tape of Dr. Cowen's deposition; that she was not responsible, nor did she authorize the dissemination of medical records;[20] that she did not tell Karen to disobey the court order, did not instruct her staff to tell clients to disobey court orders, and that she did not use the media in an attempt to influence Judge Dale.[21]
In sum, for the majority of the Bar's allegations in both cases, Harrison's defense is that she did not do, or did not know, the things she is charged with doing or knowing. Ordinarily, such questions of fact  for example, whether Harrison knew Chrissy's whereabouts  would be resolved by the trier of fact, based on such factors as observation of witnesses' demeanor. In these cases, however, because Harrison neither filed answers, nor appeared at the September 13, 1991, hearing, resolution of all factual issues was governed by the law of default. The result under a default is that the allegations of the moving party may be accepted as true. Therefore, the all questions of fact were automatically resolved in the Bar's favor.
We do not favor default judgments. Our judicial system favors disposition of cases  disciplinary or otherwise  on their merits. See Terrell v. Mississippi State Bar, 635 So.2d 1377 (Miss. 1994); Sartain v. White, 588 So.2d 204, 208 (Miss. 1991). Nevertheless, discipline by default judgment may be proper (see Terrell, supra), and disbarment by default judgment is not objectionable, per se. See Barfield v. Mississippi State Bar Association, 547 So.2d 46 (Miss. 1989).
The majority of the charges against Harrison concern dishonesty towards the court, and towards third parties, with regard to her knowledge of Chrissy Foxworth's whereabouts, and those of the Newsom children. Related charges concern cooperating with others to perpetrate such dishonesty, or allowing her employees to perpetrate such dishonesty.
We have found disbarment proper for attorneys guilty of offenses involving acts of dishonesty, deceit or misrepresentation. See, e.g., Stegall v. The Mississippi Bar, 618 So.2d 1291, 1294 (Miss. 1993); Foote v. Mississippi State Bar Association, 517 So.2d 561 (Miss. 1987); Brumfield v. Mississippi State Bar, 497 So.2d 800 (Miss. 1986). We assume it is unnecessary to elaborate on why individuals known to have been dishonest with their clients, their adversaries, or the courts, are unworthy to practice law.
We are required to take the multitude of violations in the Bar's Complaints as true and confessed. As a result, we find that Harrison engaged in a pattern of dishonest conduct towards the court and third parties in both the Singley and Newsom cases. The sincerity of Harrison's belief in her clients do not excuse such behavior.
An isolated incident of dishonesty might have merited more lenient treatment by the Tribunal or this Court. However, Harrison's continuous course of dishonesty, with regard to knowledge of her clients' children's whereabouts, supports our severest punishment. We find that Harrison's pattern of dishonest conduct merits disbarment in both the Singley and Newsom cases.
We further find that other instances of Harrison's conduct  in particular, signing the option contract for "The Garnett Harrison Story," while continuing to represent the estate of Dorrie Singley  support disbarment. This incident is discussed further below.

*227 ABA Standards for Imposing Lawyer Sanctions?

Harrison urges us to adopt the ABA Standards for Imposing Lawyer Sanctions; presumably, she believes that if we were to judge her case by these Standards, we would impose a sanction less severe than disbarment.
As noted above, we believe that the ABA Standards provide helpful guidelines in reviewing disciplinary cases. Nonetheless, we decline Harris' request that we adopt the Standards wholesale.
Moreover, we note that the Standards offer Harrison little sanctuary. For several of the violations with which she is charged, the Standards suggest disbarment as the proper sanction. Two examples are provided.
Rule 6.11 of the Standards provides that:
Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.
Taking all the allegations of the Formal Complaints as "true and confessed," the Tribunal found that Harrison had lied to the court concerning her knowledge of Chrissy Foxworth and the Newsom children's whereabouts, as well as simply withholding that information from the court. Such conduct had a "significant or potentially significant adverse effect" on the custody proceedings in each case in the chancery court, since it delayed the return of the children to their fathers as ordered by the judge. Therefore, disbarment would be proper under this Rule in either the Foxworth/Singley case, or the Newsom case, or both.
Rule 7.1 of the Standards provides that:
Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal profession.
In signing the option contract for "The Garnett Harrison Story," Harrison violated Rule 1.8(d) of the Rules of Professional Conduct. Such transaction, for which Harrison was paid $10,000, is prohibited as creating a conflict of interest between a lawyer and client. Her clients  at that point, the estate of Dorrie Singley, and Bernice Singley as administratrix  may not have been injured by Harrison's signing of the option contract. However, the potential serious injury to the legal profession is manifest. Realization of personal profit from representation of a client creates an appearance of impropriety which the profession can ill afford. Therefore, disbarment is proper under this Rule.
The ABA Standards provide a list of mitigating circumstances which may be considered in imposing sanctions. No doubt Harrison would urge the Court to consider, in her case, such mitigating factors as 9.32(c) personal or emotional problems; and/or (h) physical or mental disability or impairment, to justify a reduction in the degree of discipline.
Perhaps consideration of such mitigating factors is warranted. However, if Harrison wishes the Court to take into consideration the mitigating factors, she will have to "take the bitter with the sweet," for the ABA Standards also contain a list of aggravating circumstances which may justify an increase in the degree of discipline. Such factors include 9.22(c) a pattern of misconduct; (d) multiple offenses; (g) refusal to acknowledge wrongful nature of conduct; (j) indifference to making restitution.
In sum, we find justification for disbarment based on other aspects of Harrison's conduct in the Foxworth/Singley and Newsom cases. This is true under both our Court's decisions and the ABA Standards for Imposing Lawyer Sanctions.

V.

MOTION TO REMAND OR IN THE ALTERNATIVE TO PERMIT SUPPLEMENTING OF RECORD OR OTHER APPROPRIATE RELIEF
Harrison filed Motions to Remand Or In The Alternative To Permit Supplementing *228 Of Record Or Other Appropriate Relief, with supporting memos and exhibits. The motion requests that this Court 1) remand the matters to a new Complaints Committee for de novo proceedings, in which Harrison is represented by counsel; 2) remand the matters to a new Complaint Tribunal for taking of evidence; 3) permit supplementation of the records with the attached exhibits; or 4) remand the matters to a new Complaints Tribunal for consideration of any violations of Harrison's rights.
As noted above, Harrison consistently declined to avail herself of the opportunities to be heard provided by the disciplinary process. She failed to file answers to the Bar's Complaints, failed to pursue discovery, and failed to attend the Tribunal's hearing. In light of such inaction, we are not inclined to offer Harrison a fresh crack at the disciplinary process. We therefore decline to remand Harrison's cases to a new Complaint Tribunal, or to consider materials not properly before us in the record.

VI.

CONCLUSION
Harrison received adequate notice of the Bar's charges against her, and was provided with all process due under our disciplinary rules, as well as federal and state constitutions. Harrison's own inaction, not any action taken by the Bar or Complaint Tribunal, led to default judgments against her in both cases. Accepting, as we must, that the Bar's allegations are true, we find that Harrison engaged in a pattern of dishonesty towards the court concerning her knowledge of the whereabouts of her clients' children. Such dishonest conduct merits disbarment in both the Singley and Newsom cases. In addition, Harrison's other conduct  in particular, signing an option contract for "The Garnett Harrison Story," while continuing to represent the Singley estate  supports disbarment. We affirm both disbarment judgments.
AFFIRMED.
HAWKINS, C.J., and BANKS, McRAE and SMITH, JJ., concur.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN and PITTMAN, JJ., not participating.
NOTES
[1] For fuller discussion, see See Chrissy F. v. Mississippi Dept. of Public Welfare, 995 F.2d 595 (5th Cir.1993) and Chrissy F. v. Dept. of Public Welfare, 780 F. Supp. 1104 (S.D.Miss. 1991).
[2] Singley retained Harrison on November 26, 1986.
[3] Harrison states that her motion for appointment of a guardian ad litem was denied by the chancellor before trial.
[4] It appears that no counsel for Foxworth appeared at this deposition. Harrison states that August 23, 1987, was the only day Dr. Russell was available for deposition, and that she was not available to come to the contempt hearing on August 28, 1987.
[5] The district court originally dismissed the suit under 12(b)(1) of the F.R.C.P., on the grounds that the federal suit was "inextricably intertwined" with the state court proceedings. However, the 5th Circuit reversed, and directed the court to appoint a guardian ad litem or next friend for Chrissy. The court appointed Medley as Chrissy's next friend. A nonjury trial was held in June 10, 1991. The district court found that Dale and Upton had violated Chrissy's right of access to courts, and that Upton had violated Chrissy's procedural due process rights. The district court enjoined Upton to conduct a new youth court hearing to reexamine the allegation of Chrissy's sexual abuse. Claims against other defendants were dismissed. On appeal, the 5th Circuit held that the district court lacked jurisdiction to grant injunctive relief against Dale and Upton. The judgments against them were reversed, while the dismissal of other claims was affirmed. See Chrissy F. v. Mississippi Dept. of Public Welfare, 995 F.2d 595 (5th Cir.1993).
[6] Harrison contends in her brief that Chancellor Dale "left specific instructions that Harrison and Ducote could not speak to Karen in jail, despite the fact that they continued to represent her in federal district court." For this reason, Harrison asserts, Karen "lost faith" in her, and fired her on September 28, 1987.
[7] The Bar states that "in accordance with his duties," the executive director of the Bar forwarded notice of the filing and a copy of the Formal Complaint to Harrison.
[8] Harrison's letter stated that it was "Re: Singley/Foxworth Complaints, # 90-B-361." It is not clear from the record how Harrison was apprised of the two Formal Complaints against her. One document in the record is an accounting from the Washington County, Vermont Sheriff's Department to the Mississippi Bar, referencing an "Attempted Service." The accounting, dated June 1, 1990, and marked received by the Bar on June 8, 1990, states that the "Mississippi State Bar vs. `An Attorney  Garnett Harrison'" was returned unserved.
[9] The certificate of service states that a copy was sent to Harrison at her Montpelier address.
[10] There was some discussion at the beginning of the hearing as to whether Harrison's motions to set aside entry of default and to stay proceedings should be taken up before the Bar's motion for default judgment. Ultimately, the Tribunal determined that the motions for default should be addressed first.
[11] One exhibit was the informal admonition for a "minor ethical violation." Another was an option contract for "The Garnett Harrison Story," and the third an advertisement for Harrison & Rosenfeld, a firm apparently co-founded by Harrison after her move to Vermont.
[12] The December 11, 1989, letter referred to by Harrison was addressed to Michael Martz. In the letter, Harrison requested a transcript from a January 5, 1989, hearing on the complaints. She also responded to a number of the charges against her, and stated that "there are several charges which are not clear to me and for which I require additional information." Harrison's responses to the charges will be discussed later in the section on the merits.
[13] A February 4, 1992 order assessed costs and expenses against Harrison in the amount of $568.66 in the Singley/Foxworth case, and $404.46 in the Newsom case.
[14] Possibly, in some circumstances, "otherwise defend" might be construed to include conduct other than motions or pleadings. If, for example, a non-lawyer defendant, without counsel and unfamiliar with civil procedure, wrote a letter to the judge denying allegations in a complaint, it might be within that judge' discretion to consider such action as a defense to the suit. However, as the Bar points out, Harrison was an attorney, an officer of the court, charged with knowledge of procedural and evidentiary rules.
[15] Harrison contends that her discovery requests constituted "responsive pleadings," thus distinguishing her case from Barfield, in which no such requests were filed. As the discovery requests were determined above not to constitute an answer or responsive pleading, this attempt to distinguish her case fails.
[16] In fact, Rule 34(b) provides that the party requesting discovery specify a reasonable time, place and manner for inspection.
[17] The Proffer stated that on January 18, 1988, Singley's new lawyer, Chester Nicholson, wrote to Harrison requesting the diary, and that Harrison did not honor such request. A copy of the Nicholson's letter was attached.
[18] The Opinions do not match their findings to the Rules; therefore we cannot know with certainty which conduct the Tribunal found to be in violation of which Rules. We presume that our own matchings correctly represent the Tribunal's findings.
[19] Bar's Proffer, Exhibit 8.
[20] Harrison states that "to the best of (her) recollection this action was authorized by Karen Newsom."
[21] Rather, Harrison states, she "merely attempted to educate the public about what was happening in the court system with regard to these children who had substantial evidence of child sexual abuse by their father."